FILED
United States Court of Appeals
Tenth Circuit

August 11, 2009

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

BARBARA COLLEEN HOLCOMB

Plaintiff - Appellant,

v.

No. 08-6183

UNUM LIFE INSURANCE
COMPANY OF AMERICA,

Defendant - Appellee.

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D. Ct. No. 5:07-CV-00862-W)**

Robert J. Rosati, Fresno, California, appearing for Appellant.

Phillip G. Whaley (Patrick M. Ryan and Corey A. Neller, with him on the brief),
Ryan Whaley Coldiron Shandy PC, Oklahoma City, Oklahoma, appearing for
Appellee.

Before **TACHA**, **O'BRIEN**, and **GORSUCH**, Circuit Judges.

**TACHA**, Circuit Judge.

Barbara Holcomb sued Unum Life Insurance Company of America

("Unum"), challenging Unum's decision to deny her long-term disability benefits

under the Employee Retirement Income Security Act of 1974 ("ERISA"). *See* 29 U.S.C. § 1001 et seq. The district court ruled in Unum's favor, and Ms. Holcomb appeals. We have jurisdiction under 28 U.S.C. § 1291 and AFFIRM.

## I. BACKGROUND

Ms. Holcomb began working as a "Senior Vice President/Customer Service Officer" at BancFirst Corporation ("BancFirst") in 1999. In February 2003, Ms. Holcomb, who had been diagnosed with fibromyalgia and lupus, ceased working. She reported experiencing extreme fatigue and arthritis that limited her capacity to bend, walk, process information, and sit or speak for extended periods of time. Shortly thereafter, she applied for long-term disability benefits under BancFirst's long-term disability insurance plan, Policy No. 586452 001 (the "Policy"), which was issued and administered by Unum. The Policy gives Unum "discretionary authority to determine . . . eligibility for benefits and to interpret the terms and provisions of the policy." Under the Policy:

> You are disabled when Unum determines that:
>
> - you are limited from performing the material and substantial details of your regular occupation due to your sickness or injury; and
> - you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.
>
> After 24 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation[1] for which you are reasonably fitted by

---

[1]The Policy defines "gainful occupation" as "an occupation that is or can be

(continued...)

education, training or experience.

. . .

We will stop sending you payments and your claim will end on the earliest of the following:

- during the first 24 months of payments, when you are able to work in your regular occupation on a part-time basis but you choose not to;
- after 24 months of payments, when you are able to work in any gainful occupation on a part-time basis but you choose not to; . . .
- the date you are no longer disabled under the terms of the plan . . . .

Pursuant to the Policy, if an insured's disabilities are "due to mental illness" or "based primarily on self-reported symptoms," the insured is entitled to a "lifetime cumulative maximum benefit period . . . [of] 24 months." The Policy defines self-reported symptoms as:

the manifestations of your condition which you tell your physician, that are not verifiable using tests, procedures or clinical examinations standardly accepted in the practice of medicine. Examples of self-reported symptoms include, but are not limited to headaches, pain, fatigue, stiffness, soreness, ringing in ears, dizziness, numbness and loss of energy.

Unum began paying long-term disability benefits to Ms. Holcomb on May 23, 2003. Unum advised her that its payments were "under reservation of rights," meaning Unum did not concede present or future liability. In August 2003, one of Unum's on-site physicians reviewed Ms. Holcomb's medical file and filed a report that concluded that her complaints of pain were not supported by "physical

[1](...continued)
expected to provide you with an income at least equal to your gross disability payment within 12 months of your return to work."

exam, testing or radiological findings." The report noted, however, that her medical records were insufficient "to allow for an independent assessment of the claimant's functional capacity." In September 2003, Unum determined it was liable under the Policy and it removed its reservation of rights. It then informed Ms. Holcomb that it would continue to pay her benefits during a "limited pay period up to 24 months" because her claim fell under the Policy's provision for "[d]isabilities . . . primarily based on self-reported symptoms, and disabilities due to mental illness . . . ." In October 2003, Ms. Holcomb's primary care physician's office reported that although Ms. Holcomb could occasionally lift between one and ten pounds, bend, kneel, and climb stairs, she could not perform even one hour of sedentary work during an eight-hour workday.

From late 2003 through early 2005, Unum regularly requested updated medical records from Ms. Holcomb and her treating physicians. These records generally indicated that she was suffering from fatigue, diffuse pain, intermittent headaches and rashes, joint swelling, vision problems, and memory difficulties. In February 2005, Unum notified Ms. Holcomb that:

> [a]s of May 22, 2005 you will have reached 24 months of benefit payments. As we discussed, so that we can ensure that we are making the most appropriate decision with regards to the adjudication of your claim and taking into consideration your current medical condition, we will be reviewing your file to determine if you qualify for continued benefits.

After May 22, 2005, Unum continued to pay benefits to Ms. Holcomb under a

reservation of rights.  In June 2005, Unum on-site physician Tony Smith (the "OSP") conducted a clinical review of medical records Unum had obtained from several of Ms. Holcomb's physicians.  He found no significant change in Ms. Holcomb's reported symptoms from 2003 to 2005.  He also found no significant change in Ms. Holcomb's exams, laboratory tests, or imaging studies.  Based on the data in Ms. Holcomb's medical file, he concluded that it was reasonable to assume she would have difficulty with prolonged walking, heavy lifting, frequent bending, and heavy pushing and pulling.  He also concluded that her file did not "document a complete lack of work capacity."

Following the OSP's clinical review, Unum requested additional medical information from Ms. Holcomb's primary care physician, Dr. Craig Carson.  Dr. Carson's office responded with a report indicating that Ms. Holcomb had been diagnosed with lupus, memory loss, headaches, fibromyalgia, depression, gastroesophageal reflux disease, Sjorgren's syndrome, and fatigue.  The report stated that her principal complaint was fatigue and that her cognitive deficits were not supported by objective evidence.  In addition, the report advised that in the absence of objective data concerning Ms. Holcomb's functional abilities, it was necessary "to rely on the patient's history of present illness and take [her] word for it when [she] report[s] that [she is] unable to walk, talk, sit, lift, etc. for any period of time."  Although the report counseled against Ms. Holcomb returning to work, its conclusions about her cognitive deficits and functional disability were

generally based on self-reported symptoms.

In July 2005, Dr. Robert Anfield, another Unum physician, evaluated both the OSP's review of Ms. Holcomb's medical records and several assessments by Dr. Carson and his staff. Dr. Anfield agreed with the OSP's analysis, concluding that Ms. Holcomb was capable of engaging in "work activities." In addition, Dr. Anfield stated that "Ms. Holcomb's self-reported incapacitating symptoms are primarily the feature of [fibromyalgia] . . . [and] the label 'fibromyalgia' provides no pathophysiologic foundation upon which to base a set of restrictions and limitations."

Also in July 2005, Unum requested Ms. Holcomb's medical records from the Social Security Administration, which had conducted a Disability Determination and Transmittal ("DDT"). The DDT identified Ms. Holcomb's primary diagnosis as "affective mood disorders." It stated that no secondary diagnosis could be established due to insufficient medical evidence.[2] The DDT was accompanied by a psychiatrist's evaluation and conclusion that "[m]edical evidence shows [Ms. Holcomb] can do simple tasks, but she cannot do complex work. She cannot cope with the stress of a work environment or a work schedule."

In August 2005, Dr. Carson sent Unum a letter to "clarify a few matters."

_____

[2]Because a psychiatrist conducted the report, it is unclear whether the DDT was limited to an evaluation of Ms. Holcomb's mental health.

Dr. Carson wrote, "[y]our antagonistic letters and disclaimers suggest a remarkable lack of understanding for systemic lupus erythematosus and its ability to cause functional limitations in patients who are so unfortunately affected." He wrote that Unum was "try[ing] to make a case that [Ms. Holcomb's] problems are all subjective and thus mental." He summarized "the abnormal [laboratory] studies that have been a consistent feature of [Ms. Holcomb's] disease," and he urged:

> What I wish you to understand is that the mental aspect of her illness is only a minor aspect. Far greater are the problems of widespread systemic inflammation in the connective tissues. This is most marked by a pronounced arthritis and [her] episcleritis,[3] not by her mental problems. . . . My recommendations for medical retirement based on total and permanent disability [are] based solely on functional limitations apart from any mental disorder. She can no longer engage in any work related activities such as sitting, standing, walking, lifting, carrying or handling objects using her hands.

In September 2005, the OSP reviewed Dr. Carson's letter, reports from Ms. Holcomb's ophthalmologist, and 233 pages of medical records Ms. Holcomb had submitted to Unum during the previous three months. The OSP reported that "[b]ased on a review of the additional medical information and with a reasonable degree of medical certainty, the additional medical records . . . do not change [my] conclusions . . . from a general medical standpoint." Unum's Vocational Rehabilitation Consultant ("VRC") then conducted an occupational analysis to

---

[3]Dr. Carson described episcleritis as "a very serious eye condition which can lead to blindness."

determine whether Ms. Holcomb's stated restrictions and limitations would preclude her from her occupation. The VRC reviewed the OSP's conclusions, Dr. Anfield's review of those conclusions, and vocational descriptions for jobs similar to Ms. Holcomb's. The VRC concluded:

> [I]t is reasonable that [Ms. Holcomb's] occupation could be performed within the physical restrictions and limitations supported for [her]. The occupation does not require prolonged walking, heavy lifting, frequent bending and heavy push/pull. Also, based on the high level of responsibility the occupation would allow for control over positioning to allow for frequent change of position to perform the material and substantial duties of the occupation.

The VRC also determined that Ms. Holcomb would be able to perform several other occupations within the financial industry that would pay at least the equivalent of her disability benefit.

By letter dated September 27, 2005, Unum notified Ms. Holcomb that it would no longer pay disability benefits to her. The letter explained that Unum had concluded she "would be able to perform the material and substantial duties of [her] regular occupation" and could perform at least five other "gainful occupations," based on her restrictions, limitations, education, training, and experience. Unum also stated that it would not require her to repay the benefits it had disbursed to her after May 22, 2005, even though pursuant to the Policy she was not entitled to long-term benefits beyond that date.

On November 17, 2005, Ms. Holcomb's husband sent Unum a letter appealing its termination of her benefits and asking Unum to review her file. A

Unum nurse reviewed the file and determined that Dr. Carson's restrictions and limitations for Ms. Holcomb were not "reasonable," were not "supported by observable physical examination or diagnostic testing," and "appear[ed] to be excessive and overly restrictive based on the exam findings." In December 2005, Unum requested that Dr. George Morton, an independent, board-certified rheumatologist, review Ms. Holcomb's medical file. The file contained an extensive collection of physicians' reports, laboratory results, and imaging studies. It also included records from each of Ms. Holcomb's visits with Dr. Carson between April 2002 and April 2005, as well as Dr. Carson's August 2005 letter to Unum. In January 2006, Dr. Morton concluded that despite Ms. Holcomb's physical restrictions—which he determined would limit her ability to use a keyboard and to sit or stand in one position for an extended period—he "would anticipate that in her occupation one could work within these limitations." In addition, Dr. Morton wrote that

> [m]ost of the claimant's reduction of capacity is from self-reported symptoms. The objective impairment documented in the chart is the swelling and limitation of . . . joints of her hands. Her fatigue and the degree of pain are subjective self-reported complaints. The degree of functional impairment from her cognitive and emotional impairments secondary to her depression should be deferred to an assessment by a psychiatrist or a trained occupational psychologist.

Unum then requested that Ms. Holcomb undergo an independent neuropsychological examination from Dr. James Scott at the University of Oklahoma Health Sciences Center. Dr. Scott found that her response pattern on

self-reported measures suggested "a considerable psychological overlay to her reported physical condition." He determined that Ms. Holcomb "demonstrated average global intellectual functioning," and that her "[p]erformance on measures of attention/concentration, processing speed, language, immediate verbal and nonverbal memory, and abstraction/problem solving ability all fell within the expected functional range." Although Dr. Scott determined that Ms. Holcomb was experiencing a mild and intermittent memory problem, he concluded that "[d]ue to her intact general intellectual and problem solving ability, the utilization of compensatory strategies (e.g., memory notebook) would likely ameliorate this situation."

On June 8, 2006, Unum notified Ms. Holcomb that after reviewing her appeal it had determined that it had appropriately denied her claim. She then filed suit in federal district court, seeking a declaratory judgment that she was disabled and entitled to long-term disability benefits under the Policy. She alleged that by denying her claim Unum had violated ERISA, 29 U.S.C. § 1132(a)(1) and (3). After examining the administrative record, the district court issued an order in Unum's favor. Ten days later, Ms. Holcomb filed a motion to alter or amend the district court's judgment under Fed. R. Civ. P. 59(e). Ms. Holcomb argued that the United States Supreme Court's decision in *Metropolitan Life Insurance Co. v. Glenn*, – U.S. –, 128 S. Ct. 2343 (2008), was an intervening

change in controlling law that warranted reconsideration.[4] The district court

reexamined its order in light of *Glenn* and denied Ms. Holcomb's motion.

On appeal, Ms. Holcomb argues that Unum abused its discretion by

terminating her benefits. Ms. Holcomb also argues that the district court abused

its discretion by denying her Rule 59(e) motion to alter or amend its judgment.

## II. DISCUSSION

A.    <u>Standard of Review</u>

We review a plan administrator's decision to deny benefits to a claimant, as

opposed to reviewing the district court's ruling. *See Allison v. Unum Life Ins. Co.

of Am.*, 381 F.3d 1015, 1021 (10th Cir. 2004). When a plan "gives the

administrator or fiduciary discretionary authority to determine eligibility for

benefits or to construe the terms of the plan," we review the decision for abuse of

discretion. *Fought v. Unum Life Ins. Co. of Am.*, 379 F.3d 997, 1002–03 (10th

Cir. 2004) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115

(1989)). Our review is "limited to the administrative record—the materials

compiled by the administrator in the course of making his decision." *Fought*, 379

F.3d at 1003.

The parties do not dispute that the Policy gives Unum discretionary

authority to determine eligibility for benefits and to construe the terms of the

---

[4]The Supreme Court decided *Glenn* two days after the district court's initial
ruling.

plan.  Nor do they dispute that Unum operates under an inherent conflict of

interest because it is in a position to "favor, consciously or unconsciously, its

interests over the interests of the plan beneficiaries."  *See id.* at 1003 (quotations

omitted).  *See also Pitman v. Blue Cross & Blue Shield of Okla.*, 217 F.3d, 1291,

1296 n.4 (10th Cir. 2000) (explaining that when an insurer is also the

administrator of a plan it operates under an inherent conflict of interest).  We

therefore weigh the conflict of interest "as a 'facto[r] in determining whether

there is an abuse of discretion.'"  *Fought*, 379 at 1003 (quoting *Firestone*, 489

U.S. at 115); *see Glenn*, 128 S. Ct. at 2350.

In prior cases where a plan administrator has operated under a similar

conflict, we have shifted the burden to the administrator "to establish by

substantial evidence that the denial of benefits was not arbitrary and capricious."

*Fought*, 379 F.3d at 1005; *see Flinders v. Workforce Stabiliz'n Plan of Philips

Petro. Co.*, 491 F.3d 1180, 1190 (10th Cir. 2007). *Glenn* expressly rejects and

therefore abrogates this approach.  *See Glenn*, 128 S. Ct. at 2351 (holding it is not

"necessary or desirable for courts to create special burden-of-proof rules, or other

special procedural or evidentiary rules focused narrowly upon the evaluator/payor

conflict").[5]  *Glenn* embraces instead a "combination-of-factors method of review"

that allows judges to "tak[e] account of several different, often case-specific,

---

[5]Ms. Holcomb's argument that under *Fought* Unum bears the burden of
proving "facts supporting an exclusion of coverage" is therefore unavailing.  *See
Fought*, 379 F.3d at 1007.

factors, reaching a result by weighing all together." *Id.* A conflict "should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision . . . [and] should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy . . . ." *Id.*

B.      Unum's Denial of Benefits Under the Combination of Factors Standard

Applying a "combination of factors" analysis, we conclude that Unum did not abuse its discretion in denying benefits to Ms. Holcomb. Unum took steps to reduce its inherent bias by hiring two independent physicians—one who reviewed Ms. Holcomb's file (Dr. Morton), and one who examined her (Dr. Scott). *See id.* at 2351 (holding that increased deference is afforded a plan administrator that takes steps to reduce inherent bias). Unum did not rely solely on the evaluations and medical opinions of its own on-site physicians and nurses. We therefore give the conflict-of-interest factor limited weight in evaluating whether Unum abused its discretion. *See id.* (stating that the conflict-of-interest factor "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy").

In addition, the administrative record demonstrates that Unum diligently endeavored to discover the nature of Ms. Holcomb's ailments. Beginning in May 2003, it routinely requested Ms. Holcomb's updated medical records and it conducted its own clinical reviews of these records. By May 2005, Unum had

-13-

received a large volume of reports, letters, imaging studies, and exams that were not entirely consistent. Unum then solicited expert evaluations from independent medical and psychological examiners, and it performed both vocational assessments and occupational analyses. Meanwhile, Unum paid benefits to Ms. Holcomb, even though the twenty-four month period for disabilities "due to mental illness" or "based primarily on self-reported symptoms" had expired.

Dr. Carson and his staff believed that Ms. Holcomb was unable to work, even in a sedentary capacity, and that her disability was not caused by mental illness. When Unum's nurse determined that Dr. Carson's recommended restrictions and limitations "appear[ed] to be excessive and overly restrictive based on the exam findings," Unum did not rely on the nurse's determination alone but requested an independent evaluation from Dr. Morton, a board-certified rheumatologist. Dr. Morton evaluated a large volume of Ms. Holcomb's medical data, including records from her visits with Dr. Carson and his letter regarding Unum's investigation. Dr. Morton concluded that the majority of Ms. Holcomb's medical problems derived from "self-reported symptoms." He also recommended sending Ms. Holcomb to a psychiatrist or an occupational psychologist.

Unum then referred Ms. Holcomb to Dr. Scott, an independent neuropsychologist. He determined that Ms. Holcomb "demonstrated average global intellectual functioning" and that her performance on a variety of cognitive measures "fell within the expected functional range." Although he found that she

had a problem with delayed memory, he determined that "[d]ue to her intact general intellectual and problem solving ability, the utilization of compensatory strategies (e.g., memory notebook) would likely ameliorate this situation."

Regarding that diagnosis, Ms. Holcomb argues that the Policy does not include a qualification that she be able to work in any gainful occupation "with accommodations," but that she be able to work in any gainful occupation for which she is qualified. She asserts that Unum has attempted to rewrite the Policy for the purpose of denying her benefits. Because Ms. Holcomb's argument overstates the significance of one sentence in a large administrative record, it is unavailing. Although Dr. Scott concluded that Ms. Holcomb was experiencing memory difficulties, he described the difficulties as both "mild" and "intermittently manifested." He generally characterized her cognitive and global intellectual functioning as "average" and "within the expected functional range." These characterizations are consistent with Dr. Morton's conclusion that "in her occupation, one could work within these limitations." Moreover, each vocational and occupational assessment concluded that she was fit for multiple gainful occupations that reasonably matched her education, training, and experience.[6] We

---

[6]Ms. Holcomb argues that "Unum did not evaluate the other jobs it claims [she] can do with reference to" her keyboarding limitations, and that Unum's alleged disregard for evidence of her keyboarding disability constitutes an abuse of discretion. Unum did, however, conduct an occupational analysis on September 24, 2005, in which the VRC analyzed the "handling, fingering, and keyboarding" abilities required for Ms. Holcomb's occupation. The VRC

(continued...)

therefore conclude that Unum did not rewrite the Policy in deciding that Ms. Holcomb was fit for these occupations.

Finally, we note that several of the factors that led the Supreme Court to hold against the plan administrator in *Glenn* are not present in this case. First, the insurance company in *Glenn* "encouraged [the insured] to argue to the Social Security Administration that she could do no work," and then ignored its conclusion. *Glenn*, 128 S. Ct. at 2352. There is no evidence that Unum encouraged Ms. Holcomb to argue to the Social Security Administration that she could not work. The Court in *Glenn* also noted the insurance company's failure to provide independent experts with all of the necessary documentation. *Id.* In this case, Unum furnished the independent doctors with all of the necessary information, including information from Ms. Holcomb's personal physician that challenged Unum's conclusions.

For the foregoing reasons, we conclude that Unum's decision denying benefits to Ms. Holcomb was not an abuse of its discretion.

C.    Ms. Holcomb's Motion to Alter or Amend the Judgment

---

[6](...continued)
determined that Ms. Holcomb could perform this occupation despite her physical restrictions and limitations.

In addition, Dr. Morton concluded that despite Ms. Holcomb's keyboarding limitations, "I would anticipate that in her occupation one could work around these limitations." We therefore conclude that Unum did not disregard evidence of Ms. Holcomb's keyboarding disability and the way that disability would affect her ability to work in "any gainful occupation" for which she was reasonably suited.

We review a district court's denial of a motion to alter or amend its judgment for abuse of discretion. *Adams v. Reliance Standard Life Ins. Co.*, 225 F.3d 1179, 1186 (10th Cir. 2000). Having determined, under *Glenn*, that Unum acted within its discretion in denying benefits to Ms. Holcomb, we also conclude that the district court did not abuse its discretion by declining to alter or amend its judgment in light of *Glenn*.

## III.  CONCLUSION

For the foregoing reasons, we AFFIRM the district court's order.