**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 23, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

ROXANN LOUGHRAY,

      Plaintiff-Appellant,

v.

HARTFORD GROUP LIFE
INSURANCE COMPANY,

      Defendant-Appellee.

No. 07-1189

(D.C. No. 05-cv-01450-CBS-BNB)

(D. Colo.)

**ORDER AND JUDGMENT**[*]

Before **TACHA**, **EBEL** and **LUCERO**, Circuit Judges.

In this action, pursued under the Employee Retirement Income Security Act

("ERISA"), Plaintiff-Appellant Roxann Loughray challenges the decision of Defendant-

Appellee Hartford Group Life Insurance Company ("Hartford") to terminate Loughray's

long-term disability benefits paid under a group plan provided through her former

employer, Ultimate Electronics. Loughray claims that she has been disabled since April

2000, when she first stopped working because of health problems, and that she remains

---

[*] This order and judgment is not binding precedent except under the doctrines of law of
the case, res judicata and collateral estoppel. It may be cited, however, for its persuasive
value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

disabled because of a number of subjective symptoms—headaches, fatigue, cognitive dysfunction—resulting from some medical condition or conditions that have proven difficult to determine. Initially, Hartford deemed Loughray disabled based on a thyroid dysfunction, but after that condition was resolved, Hartford terminated Loughray's benefits, upholding its decision three separate times after considering new information submitted by Loughray. The district court concluded that while Loughray reported several subjective symptoms, Hartford did not abuse its discretion in concluding that the medical evidence did not support deeming Loughray disabled and entitled to long-term disability benefits. Loughray appeals that decision, and we have jurisdiction to review that final decision pursuant to 28 U.S.C. § 1291. We agree with the district court, and therefore, we AFFIRM.

## I.

## BACKGROUND

### A. The Long-Term Disability Benefits Plan

Loughray worked as a salesperson for Ultimate Electronics, beginning in September 1992. She worked five days per week, eight or nine hours per day, and she was paid based on sales commissions. As a salesperson, her job duties included interacting with customers, demonstrating products, and operating credit card processors, cash registers, and other store equipment. Her job also involved frequent standing and walking.

2

During her employment at Ultimate Electronics, Loughray was covered by the Ultimate Electronics Group Disability Plan ("the Plan"). Both parties agree that Hartford both administered and insured the Plan.[1] Under the Plan, a disabled employee under age 61, such as Loughray, would receive long-term disability benefits for as long as she was disabled, up until she reached age 65. The Plan defines disability as follows:

> *Disability* means that during the *Elimination Period* [90 days after an eligible employee becomes disabled] and the following 24 months, *Injury* or *Sickness* causes physical or mental impairment to such a degree of severity that *You* are:
>
> 1. continuously unable to perform the *Material and Substantial Duties* of *Your Regular Occupation*; and
>
> 2. not working for wages in any occupation for which *You* are or become qualified by education, training or experience.
>
> After the *Monthly Benefit* has been payable for 24 months, "*Disability*" means that *Injury* or *Sickness* causes physical or mental impairment to such a degree of severity that *You* are:
>
> 1. continuously unable to engage in any occupation for which *You* are or become qualified by education, training or experience; and
>
> 2. not working for wages in any occupation for which *You* are or become qualified by education, training or experience.

(Aple. Supp. App. at 10-11.) Loughray claims she falls within this definition of disabled and is entitled to receive long-term disability benefits under the terms of the Plan.

---

[1] At the time Loughray's disability claim first arose, Continental Casualty Company, also referred to as CNA or CNA Group Benefits, insured and administered the plan. On January 1, 2004, however, Hartford "acquired CNA Group Benefits" (Aplt. App. at 3), and Loughray accordingly named Hartford in her suit. For purposes of convenience, we will refer to Hartford as if it had always insured and administered the plan.

**B. Loughray's Initial Health Problems and Approval for Disability Benefits**

On April 20, 2000, Loughray stopped working at Ultimate Electronics because of health problems. For several years, Loughray had been treated for a thyroid condition; however, her endocrinologist had altered her dosage of thyroid medication, which caused her to have low levels of thyroid stimulating hormone. Consequently, on April 20, Loughray went the hospital suffering from a thyroid dysfunction, which caused her to feel tired, feverish, shaky, anxious, nervous, weak, and confused, as well as to have concentration problems and suicidal thoughts. The hospital instructed her to resume her original dosage of thyroid medication and released her the same day.

After her release, Loughray continued to suffer from headaches, loss of consciousness and other ailments. On April 26, Loughray's thyroid stimulating hormone levels remained low, but by May 15, Dr. Zacharias, Loughray's original primary care physician, indicated that her thyroid condition was "<u>much</u> better (but persists)." (Aple. Supp. App. at 748.) And on May 30, blood tests indicated that Loughray's thyroid stimulating levels had stabilized.

Nonetheless, Loughray's subjective symptoms persisted and she would undergo several examinations before filing her first claim for long-term disability benefits with Hartford. In June 2000, Loughray underwent a Magnetic Resonance Imaging (MRI) and a Magnetic Resonance Angiogram (MRA) (to rule out a brain aneurysm), as well as a lumbar puncture (to rule out meningitis). All three tests produced normal results. Later in June, Loughray obtained a neurological consult from Dr. H. Rai Kakkar. Dr. Kakkar found no "neurological/musculoskeletal" problems, (Aple. Supp. App. at 787) but he

4

prescribed her Depakote for her headaches and gave her samples of Celebrex for her pain.  Dr. Kakkar also indicated that Loughray suffered for the past two months from a headache and fever "of undetermined etiology" and was not "able to perform work of any kind."  (Id. at 773.)  On the same day she visited Dr. Kakkar, Loughray was also examined by an endocrinologist, Dr. Thomas Higgins, who found that her thyroid was functioning normally and that her current symptoms were not related to her thyroid.  After these examinations, Loughray twice contacted her primary care physician, Dr. Zacharias, informing him that she felt better overall, but still had a headache, though the Depakote was ameliorating the headaches to some degree.

Soon after these examinations, on July 15, 2000, Loughray applied with Hartford for long-term disability benefits under the Plan.  She submitted reports from her examinations in support of her claim.  Loughray would later supplement this information with reports from a new primary care physician, Dr. Pierre Brunschwig, who she began to see in place of Dr. Zacharias.

Loughray began to see Dr. Brunschwig around the same time she applied for long-term disability benefits.  To Dr. Brunschwig, she reiterated her previous complaints of fatigue, headaches, intermittent fever, nausea, and high blood pressure.  Additionally, she discussed not only her previous thyroid problems with Dr. Brunschwig, but also revealed to him, apparently for the first time with any doctor, that she had fallen in 1999, hit her head, and lost consciousness.  After Dr. Brunschwig examined Loughray a few times, he and a nurse practitioner, Carol Dalton, authored a letter to Hartford indicating that Loughray had "been diagnosed with Fibromyalgia, Chronic Fatigue Syndrome and

5

uncontrollable fluctuating thyroid function resulting in hyperthyroidism alternating with hypothyroidism." (Aple. Supp. App. at 511.) The letter further explained that "[w]ith any activity, such as walking for one or two blocks, Loughray develops a fever, vertigo, blurred vision, severe nausea, and hypertension" and is therefore "currently unable to work without increasing her symptoms." (Id.) After Hartford requested clarification, Dr. Brunschwig's office clarified that Loughray's thyroid condition was in fact the cause of her disability and that her chronic fatigue and fibromyalgia were symptoms of the thyroid condition.

In September 2000, upon receiving this clarification, Hartford readily approved Loughray's application for long-term-disability benefits. Hartford deemed Loughray to have been disabled since April 20, 2000, when Loughray first went to the hospital complaining of her symptoms. Because the Plan provided for a 90-day elimination period, Hartford retroactively paid Loughray's benefits starting from July 19, 2000, ninety days after the onset of Loughray's disability. Hartford also informed Loughray that the Plan "requires that you be under the regular care of a licensed physician and provide proof of your continuing disability," and that a Hartford case manager would be "periodically contacting your doctor direct[ly] for more detailed updated reports regarding your functionality and ability to return to work." (Aple. Supp. App. at 728.) Loughray received long-term disability benefits until January 2002, at which point Hartford terminated her benefits after engaging an independent medical examiner.

During the approximately 18-month period during which Loughray received disability benefits, Hartford indeed checked on her progress. The administrative record

6

indicates that, after seeing Dr. Brunschwig in mid-August 2000 and being approved for long-term disability benefits in September 2000, Loughray did not return to Dr. Brunschwig, or any other doctors, until late March 2001.[2] Nonetheless, when Hartford requested updates, Dr. Brunschwig's office continued to respond that Loughray remained disabled. After Loughray made an unsuccessful attempt to return to work part-time, Dr. Brunschwig, on January 15, 2001, recommended that Loughray could work a maximum of ten hours per week, with a goal of returning to work full-time by June 2001. By April 2001, however, Loughray reported to Hartford that she had suffered a setback in her efforts to return to work. Ultimate Electronics would eventually terminate her a few months later on June 8, 2001.

After apparently not having seen any doctors for eight months, Loughray underwent a flurry of medical tests and examinations beginning in late March and early April 2001. She visited Dr. Brunschwig twice, complaining of extreme fatigue, loss of appetite, and sleep problems. She reported that her headaches had generally decreased slightly, but that they worsened with exertion. Blood tests revealed that Loughray had been exposed to or was suffering from bacterial and viral infections. On April 5, 2001, Dr. Brunschwig and Nurse Dalton together wrote Hartford that Loughray "continues to be plagued with her thyroid problem" and that, as a result of her weakened immune system, "she has contracted 3 infections that will require treatment for 2 to 3 more months." (Aple. Supp. App. at 702.)

---

[2] The record does contain a document indicating that Loughray went to Boulder Internal Medicine, P.C., as a new patient for a consultation regarding her thyroid condition, but the record contains no other information about this visit.

7

In light of these infections, Loughray, complaining of chronic fatigue and "slight headaches," was examined in May 2001 by Dr. Rebekah Gass of Infectious Disease Consultants. (Id. at 718-19.) Dr. Gass opined that Loughray was not suffering from infections, but "that it is more likely that this is [Loughray's] body's slow recovery from all the endocrine disorders, which are now coming under control with therapy." (Id.) Dr. Gass' examination also produced normal neurological results, blood tests that showed a normal level of thyroid stimulating hormone and no hepatitis, and a chest x-ray that did not produce abnormal results. When Loughray returned to Dr. Gass in June 2001, Dr. Gass noted that she was concerned about Loughray's "persistent endocrine abnormality." (Id. at 343-44, 438-39, 455, 820.)

After Dr. Gass's examination, Dr. Brunschwig's office wrote Hartford. First, on June 26, 2001, Dr. Brunschwig and Nurse Dalton, notwithstanding Dr. Gass's conclusion that Loughray was not currently suffering from any infections, together wrote that Loughray's thyroid condition "has resulted in a severely compromised immune system, which has resulted in her contracting four chronic and debilitating infections." (Id. at 701.) They concluded that "[t]hese infections and her thyroid condition have created extreme exhaustion for [Loughray] . . . [and] [i]t would be impossible for her to maintain any type of work schedule." (Id.) In late July 2001, after blood tests indicated Loughray had high insulin levels, Dr. Brunschwig wrote to Hartford that he had been treating Loughray for "disabling fatigue" and that "she has also been diagnosed with hyperinsulinemia [i.e., excess levels of insulin] for which she is being treated [and she] remains completely disabled relative to her previous employment." (Id. at 675.)

8

In September 2001, Loughray was diagnosed with moderate sleep apnea, for which she began using oxygen. Also in September 2001, Loughray underwent a CAT scan that produced what her doctors appeared to treat as normal results.

## C. Hartford's Subsequent Denial of Loughray's Disability Benefits Claim

In October 2001, Hartford notified Loughray that, "as part of [its] ongoing evaluation" of her claim, it was referring her case for an "independent medical review." (Aple. Supp. App. at 659.) The independent medical examiner, Dr. Eugene Truchelut, reviewed Loughray's records, but did not examine her. (Id. at 646-52.) Dr. Truchelut also spoke with Dr. Brunschwig, who informed Dr. Truchelut that he had not seen Loughray in three months, was unaware of her diagnosis of sleep apnea, and could not offer an opinion on her current state of health. After reviewing the records, Dr. Truchelut, on October 28, 2001, concluded that "the medical information furnished . . . does not support a current loss of functions capacity which would preclude the claimant from performing the type of work activities described in the employer's [Physical Demands Analysis form regarding Loughray's job duties]." (Id. at 652.) Dr. Truchelut observed that, based on the medical record, Loughray's thyroid condition was stabilized by late May 2000, but he declined to comment on Loughray's sleep apnea diagnosis because, at that time, "the recent evaluation at the National Jewish Medical Center Sleep Lab was incomplete." (Id.)

Loughray, upon learning that Hartford was sending her records for an independent review, obtained several more medical opinions indicating she remained disabled. For instance, in December 2001, Joyce Campbell, a licensed professional counselor indicated

9

that Loughray remained "unable to work at this time," despite her "strong work ethic and desire to be back in the marketplace." (Id. at 654.) Similarly, Betty James, a registered nurse who was also a "friend and colleague" of Loughray's, wrote two statements indicating the difficulties from which Loughray suffered. (Id. at 629-33.) No medical records, however, were included with these letters.

Based upon Dr. Truchelut's review of Loughray's records and despite the disability opinions of Campbell and James, Hartford notified Loughray, in January 2002, that it was terminating her long-term disability benefits because

> [m]edical information in file [sic] does not support a current loss of functional capacity, which would preclude you from performing the duties of your occupation. Although we acknowledge that you have a condition, there is no medical evidence presented to illustrate that a functional impairment is present to such a degree it could reasonably be expected to prevent you from performing your job duties as a Sales Commissioned employee.

(Id. at 628.)

## D. Loughray's First Administrative Appeal

Hartford's termination notice to Loughray also invited her to file a formal administrative appeal and to submit any additional evidence she might have supporting her disability claim. Loughray did pursue an administrative appeal and, after obtaining a six-month extension of time from Hartford, Loughray submitted additional evidence in support of her disability claim.

Loughray's additional evidence confirmed her sleep apnea diagnosis. Loughray also underwent an EEG and MRI of her brain, and other blood and stool sample tests, none of which produced results showing a disabling condition. The examiner noted a

10

blood test that showed Loughray's thyroid stimulating hormone level was low, but this test was apparently not included in the administrative record and a test dated April 23, 2002 indicated a stabilized level of the hormone.

In support of her appeal, Loughray submitted a letter to Hartford in July 2002. For the first time, Loughray asserted her symptoms of fatigue and cognitive difficulties were the result of sleep apnea and a closed head injury she suffered in 1999, one year before the April 2000 onset of her disability. Loughray offered reports from Dr. Ronald Murray of the Rocky Mountain MS Center in which Dr. Murray opined that she did not suffer from multiple sclerosis and suggested that her symptoms were "probably" caused by sleep apnea and/or a prior closed head injury. (Id. at 278.) His neurological exam, however, revealed normal results. Loughray also submitted pieces of other medical records, such as an August 2001 blood test that suggested she had been exposed to the parvovirus two or three months before, and notes from Dr. Julie Stapleton, M.D., and Dr. Thomas Groover, a chiropractor, opining on Loughray's disability, but no indication of when or for what these doctors treated Loughray.

After examining this additional evidence, Hartford's independent medical examiner, Dr. Truchelut, concluded that the evidence established only one medical problem: sleep apnea, as "documented on the polysomnogram." (Id. at 254.) Dr. Truchelut further noted that this problem, however, was treated effectively with oxygen, which Loughray had begun using in October 2001, and even without this treatment, the occupational restrictions would be unrelated to Loughray's employment as a sales

11

commissioned employee (e.g., "avoidance of . . . unprotected heights or moving

machinery"). (Id.)

In light of Dr. Truchelut's conclusions, Hartford, on August 5, 2002, upheld its

January 2002 decision to terminate Loughray's long-term disability benefits. It justified

its decision based on a lack of medical evidence to support Loughray's "self-reported

complaints" as disabling and that the sleep apnea disorder appeared under control. (Id. at

237.) Hartford concluded by informing Loughray that "[a]ll administrative remedies

offered by the Appeals process have been exhausted" and that the "decision is final and

binding." (Id. at 238.)

### E. Loughray's Additional Administrative Appeals

In response to Hartford's decision upholding its denial of Loughray's claim,

Loughray protested that the decision should not be "final and binding" since she was still

receiving treatment and being evaluated. Loughray now asserted there were three

conditions preventing her from working: "post-concussion syndrome, chronic migrainous

disorder, and central sleep apnea." (Id. at 217.)

In support of these claims, Loughray submitted additional evidence, including

reports from a physician's assistant at the Mayo Clinic Scottsdale that indicated Loughray

suffered from "post multiple head trauma with postconcussive syndrome" and [n]ew-

onset chronic daily headache" and recommended treatment with Botox injections, a

diagnosis based on Loughray's reporting that she had suffered four head injuries between

the ages of 3 and 19, plus a final fall in 1999 that caused her to lose consciousness (Id. at

222-23); a note from a doctor regarding her allergies and an apparent need to visit the

12

emergency room regularly to control the allergic reactions, but no information regarding this doctor's treatment of Loughray nor evidence of any emergency room visits; and another letter from her chiropractor, Dr. Groover, asserting that she could not work because of severe migraines, but no treatment records from him.

Despite referring to its earlier appeals decision as final, Hartford considered this evidence and, on August 30, 2002, again upheld its decision denying Loughray disability benefits. Harford informed Loughray, "[t]here will be no further review of your claim" and "the decision remains final and binding, and your administrative record remains closed." (Id. at 211.)

However, a month later, after receiving a complaint from Loughray, the Colorado Division of Insurance requested that Harford consider still more evidence from Loughray because she was struggling financially. Hartford again agreed to consider Loughray's additional evidence, even though it had already "met its obligation under ERISA requirements." (Id. at 158-60.)

This time, Loughray presented Hartford with a report of Dr. Andrea Cohen. Dr. Cohen examined Loughray in September 2002, noting some neurological deficits, some diminished sensations and reflexes, and "slowed" cognitive processing. (Id. at 169-70.) Dr. Cohen indicated Loughray's cognitive dysfunction had been present since her fall in 1999, though there is no such indication in Loughray's earlier medical records. Dr. Cohen concluded that Loughray's cognitive complaints were consistent with a closed head injury. According to Dr. Cohen, this injury combined with her headaches rendered Loughray "unable to work due to continued symptoms" from her 1999 head injury. (Id.)

13

Loughray also submitted reports from two other doctors.  Dr. Eric Eross treated Loughray's headaches with Botox injections in August 2002.  And in a letter dated October 2002, Dr. Steven Gulevich also indicated that Loughray needed Botox injections for headaches and that Loughray reported she made "two to three visits to the Emergency Department every month for extreme head pain" (id. at 151), though the administrative record does not contain medical records of any such trips to the emergency room.

Despite this additional evidence, Hartford's independent medical examiner, Dr. Truchelut, remained unconvinced, explaining that "the additional medical information supplied here does not clearly establish a functional impairment, at least from the physical standpoint, which would have precluded the claimant from her work activity as of 12/20/01 and continuing."  (Id. at 84.)  He further noted the significant gaps in Loughray's medical treatment or history that undermine Loughray's claim of "a continuous and significant functional impairment."  (Id.)  Accordingly, on October 31, 2002, Hartford affirmed—for the third time—its decision to terminate Loughray's benefits.  Hartford informed Loughray the decision was "final and binding," but that she "does have the right to pursue civil action following an adverse decision under ERISA." (Id. at 87.)

Almost 18 months later, in March 2004, Loughray again submitted additional evidence to Hartford in support of her disability claim.  This evidence consisted of a report by Dr. Stuart Kutz, Jr., Ph.D., who had conducted neurological tests on Loughray one year earlier, in March 2003.  These tests indicated that Loughray, who had several years of college experience, had an IQ of 71.  Dr. Kutz expressed his belief that

14

Loughray's efforts on the tests seemed genuine, diagnosed her as suffering from dementia, and suggested she would have difficulty working. Loughray did not offer any other evidence supporting a diagnosis of dementia. Hartford, however, refused to even consider Dr. Kutz' report because it had already issued its final decision and closed the administrative record.

Loughray ultimately brought a civil action against Hartford in August 2005. The magistrate judge, however, explained that although "Loughray's medical records show a plethora of symptoms and extensive evaluations by numerous physicians without any definitive conclusions . . . the physical, laboratory, and radiological findings were inconclusive." (Aplt. App. at 16-17.) Thus, the magistrate concluded that "the record supports Hartford's termination of disability benefits." (Id. at 17.) Loughray now appeals from that determination.

## II.

## DISCUSSION

### A. Standard of Review

This Court reviews de novo the district court's decision, according it no deference. See Weber v. GE Group Life Assurance Co, 541 F.3d 1002, 1010 (10th Cir. 2008). Instead, like the district court, our review focuses on the plan administrator's decision to deny the benefits sought by the claimant. Holcomb v. Unum Life Ins. Co. of Am., 578 F.3d 1187, 1192 (10th Cir. 2009). Ordinarily, we review de novo an administrator's decision to deny benefits, unless the plan provides otherwise. See Metro. Life Ins. Co. v. Glenn, 128 S.Ct. 2343, 2348 (2008) (citing Firestone Tire & Rubber Co. v. Bruch, 489

15

U.S. 101, 115 (1989)).  If, however, the plan affords "the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan, we review the decision for abuse of discretion."  Holcomb, 578 F.3d at 1192 (quotations and citations omitted).  In this case, the parties agree that the plan allows Hartford to make benefit determinations, and the Plan summary specifically indicates that "[t]he Administrator and other Plan fiduciaries have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to benefits in accordance with the Plan" (Aple. Supp. App. at 21; see also id. at 9.).  Thus, the abuse of discretion standard applies in this case.

In the ERISA context, we treat the abuse of discretion and the arbitrary and capricious standards of review as interchangeable.  See Weber, 541 F.3d at 1010 n.10.  Under the abuse of discretion standard, we uphold an administrator's decision "so long as it is predicated on a reasoned basis."  Adamson v. Unum Life Ins. Co of Am., 455 F.3d 1209, 1212 (10th Cir. 2006).  "[T]here is no requirement that the basis relied upon be the only logical one or even the superlative one."  Id.  Thus, we ask only "whether the administrator's decision resides somewhere on a continuum of reasonableness—even if on the low end."  Id. (quotations and citations omitted).

In cases such as this one, where the same entity serves as the administrator and payor, an inherent, dual-role conflict of interest exists.  Glenn, 128 S.Ct. at 2346.  The existence of a dual-role conflict does not alter the standard of review, but we weigh the conflict as one of many case-specific factors in determining whether the administrator's decision was an abuse of discretion.  Id. at 2350; Holcomb, 578 F.3d at 1192.  We

16

employ a sliding scale approach in which the conflict is accorded more or less weight depending upon the seriousness of the conflict, giving it greater weight "where circumstances suggest a higher likelihood that it affected the benefits decision" and less weight where the administrator has minimized the risk that the conflict would impact the benefits decision.[3] Glenn, 128 S.Ct. at 2351.

## B. Analysis

Under the Plan Loughray bore the burden to provide "written proof of loss" establishing that she was disabled as defined by the Plan. (Aple. Supp. App. at 16.) The Plan also required that Loughray provide "objective medical findings" that supported the existence and the extent of her disability. (Id.) Loughray submitted reports detailing her subjective complaints and visits to several doctors. However, Loughray has not submitted sufficient objective medical evidence that she suffers from a disabling

---

[3] Prior to the Supreme Court's recent decision in Glenn, we employed an approach in dual-role conflict of interest cases that "shifted the burden to the administrator 'to establish by substantial evidence that the denial of benefits was not arbitrary and capricious.'" Holcomb, 578 F.3d at 1192 (quoting Fought v. Unum Life Ins. Co of Am., 379 F.3d 997, 1005 (10th Cir. 2004) (per curiam)). Since Glenn, however, we have expressly rejected this burden-shifting approach as inconsistent with the approach articulated in Glenn. Holcomb, 578 F.3d at 1192-93 (explaining that Glenn expressly rejects and therefore abrogates this approach). Because the district court decided this case prior to both Glenn and Holcomb, the district court, consistent with our then-controlling precedent, applied the abrogated burden-shifting approach. (See Aplt. App. at 7 (explaining that because "Hartford is both the insurer and administrator of the Plan, the court applies the less deferential standard" that places the burden on Hartford).) In light of our resolution of this case in favor of Hartford, the application of the abrogated burden-shifting approach, which made it more difficult for Hartford to prevail in the district court, was harmless. See 28 U.S.C. § 2111 ("On the hearing of any appeal . . . in any case, the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties.").

condition to render Hartford's decision unreasonable. Thus, we cannot conclude that Hartford abused its discretion in terminating Loughray's disability benefits.

### i. Hartford's Conflict of Interest

We begin by concluding that Hartford's conflict of interest warrants only little weight in our review of the decision. In denying Loughray's claim and her appeals, Hartford employed the services of an independent medical examiner, Dr. Truchelut, and Loughray never presented persuasive evidence undermining Dr. Truchelut's independence.[4] See Holcomb, 578 F.3d at 1193 (noting that the administrator "took steps to reduce its inherent bias by hiring two independent physicians"). Moreover, in addition to considering the appeal to which Loughray was entitled, Hartford also twice considered additional information submitted by Loughray after having resolved her initial appeal— once at Loughray's request, and once at the request of a state agency. Although Hartford and Dr. Truchelut did not affirmatively seek out this new information, they did diligently consider it before reaching their respective conclusions. See id. (commending the

---

[4] Loughray attempts to challenge Dr. Truchelut's independence by merely cross-referencing an argument made before the district court. Loughray's counsel apparently found websites, which do not facially appear affiliated with Hartford or CNA, that identified Dr. Truchelut as the "medical director" for CNA Insurance, which handled Loughray's claim until it was acquired by Hartford. (Aplt. App. at 179-83 & n.3, 207.) The district court concluded that Dr. Truchelut was in fact independent because (a) he "maintained his own private practice as a Board Certified specialist in Internal Medicine at all times he provided independent consulting services to CNA Group Benefits," (b) at least one affidavit indicated he had served as an independent consultant for CNA on various occasions, but never had been employed by CNA or Hartford, and (c) there was no evidence that the content of Dr. Truchelut's reports were at all influenced by CNA or Hartford. (Aplt. App. at 9.) We agree with the district court's conclusion that "[t]he evidence simply does not support Ms. Loughray's argument that Dr. Truchelut's evaluations were unreliable due to a lack of independence." (Id.)

18

administrator for "diligently endeavor[ing] to discover the nature of [the claimant's] ailments"). Accordingly, we do not perceive a significant risk that Hartford's dual-role conflict affected its decision, and we afford that conflict little weight.

Next, we address the various disabling conditions from which Loughray asserts she suffers, concluding that Hartford had a reasonable basis to find that the evidence showing Loughray was not disabled outweighed the evidence showing she was disabled.

### ii. Thyroid Dysfunction

Hartford initially approved Loughray's claim largely based on Dr. Brunschwig and Nurse Dalton's reports that her thyroid condition rendered her unable to work. That Hartford originally deemed Loughray disabled by her thyroid condition does not foreclose Hartford's "subsequent principled review" of that determination. Kimber v. Thiokol Corp., 196 F.3d 1092, 1098 (10th Cir. 1999). In fact, prior to April 20, 2000, Loughray's thyroid dysfunction had been controlled for several years. And the parties contemplated that Loughray's disability, though qualifying for long-term disability benefits, would not be permanent. (See Aple. Supp. App. at 636-37 (anticipating Loughray would return to work by June 2001).)

At the time Hartford terminated Loughray's benefits, Loughray's thyroid condition appeared controlled. On May 30, 2000, a little over a month after Loughray first went to the hospital in April for her thyroid dysfunction, blood tests indicated that her thyroid stimulating levels had stabilized. In June 2000, an endocrinologist, Dr. Higgins, found her thyroid was functioning normally and that her symptoms were not related to her thyroid condition. Admittedly, around this same time, Dr. Gass of

19

Infectious Disease Consultants opined that Loughray continued to suffer a "slow recovery" from her thyroid and endocrine disorders as opposed to an infection. (Id. at 718-19.) Dr. Gass, however, did not update her diagnosis at any point closer to when Hartford terminated Loughray's benefits several months later in January 2002. Similarly, as of July 2001 Dr. Brunschwig's office continued to opine that Loughray remained unable to work because of her thyroid condition; however, when Hartford's independent medical examiner, Dr. Truchelut, contacted Dr. Brunschwig in November 2001 to obtain additional information on Loughray current condition, Dr. Brunschwig informed Dr. Truchelut that he could not address Loughray's current condition as it had been three months since he last examined her. In sum then, when Hartford made its decision, Loughray did not present any recent blood tests that indicated her thyroid condition remained uncontrolled, and neither Dr. Gass nor Dr. Brunschwig had provided a recent evaluation of Loughray's symptoms. Under those circumstances, Hartford quite reasonably declined to find that Loughray remained disabled based on stale diagnoses.

Tests performed during the appeals process confirmed that Loughray's thyroid condition remained under control. A blood test dated April 23, 2002 indicated a stabilized level of thyroid stimulating hormone. Moreover, Loughray's doctors began to focus on other diagnoses, such as sleep apnea and closed head injury, instead of Loughray's apparently controlled thyroid condition. Thus, under these circumstances, Hartford had a reasonable basis for concluding that Loughray did not suffer from a disabling thyroid dysfunction.

### iii.     Sleep Apnea

Medical evidence supports the claim that Loughray suffers from sleep apnea, but not the claim that it constitutes a disabling condition. The specialists at National Jewish Medical and Research Sleep Centers diagnosed Loughray with sleep apnea. However, nothing in the record suggests this condition disables Loughray or cannot adequately be controlled by using oxygen; rather Loughray was advised to use oxygen to counteract the effect of this disorder. In his review, Dr. Truchelut explained that Loughray's sleep apnea could affect her, but not in a manner that impaired her ability to work as a sales commissioned employee, and furthermore, that the condition was being treated with the use of oxygen:

> Because of the polysomnogram findings, some occupational restrictions might be reasonable, but this would be limited to avoidance of hazardous workplace environments such as unprotected heights or moving machinery, or at least until such time as her sleep specialist or other providers had determined that treatment with oxygen or some other therapy was adequate to correct the condition. This appears to have occurred at the time when the second polysomnogram of 10/01/01 was performed.

(Id. at 254.) Thus, based on this independent review, Hartford did not act arbitrarily and capriciously in concluding that Loughray was not disabled as a result of sleep apnea.

### iv.     Chronic Fatigue

Loughray has consistently complained of chronic fatigue. Although her doctors have not suggested she is exaggerating her complaints of fatigue, Loughray cannot point to any objective medical condition that may be producing the disabling fatigue of which

21

she complained.[5]  Moreover, "during interviews prior to the diagnosis of Central Sleep Apnea, [Loughray] reported no trouble with sleeping and that morning was the best time of day for [her] and as the day goes on [she] begin[s] to wear out."  (Id. at 237.)  As Hartford pointed out, "[t]his would be a reasonable occurrence within the general public and would not be considered a significant finding with regard to any medical condition."  (Id.)  As Loughray lacked any objective medical proof that her fatigue impaired her ability to perform her work as a sales commissioned employee, Hartford was not unreasonable in concluding she did not suffer from disabling chronic fatigue.

### v.    Headaches

Loughray also asserts severe headaches have rendered her disabled.  When Loughray's thyroid dysfunction became uncontrolled in April 2000, Loughray complained of severe and debilitating headaches.  Her complaints persisted even after her thyroid condition stabilized.  Subsequently, however, she indicated that while she still suffered from headaches, their severity had decreased because she had begun to take Depakote.  At other times, particularly during the several month gap in Loughray's medical record, Loughray does not appear to have regularly complained about headaches or have been taking medication for them.  At still other times, Loughray received Botox injections to treat recurring headaches.  Despite these later complaints about headaches, Loughray's physicians never provided any objective medical evidence that the headaches were disabling.  Given the lack of objective medical evidence and that Loughray's

---

[5] As discussed, the fatigue caused by sleep apnea would not render Loughray unable to perform her job duties and was being treated with oxygen.

complaints were inconsistent, it was not irrational for Hartford to reject Loughray's subjective complaints as a source of her disability.

Loughray's other evidence would not support finding Hartford acted arbitrarily and capriciously. In mid-2002, a physician's assistant and a doctor at the Mayo Clinic indicated Loughray suffered from headaches and treated her with Botox injections. Neither, however, addressed whether Loughray's headaches rendered her disabled, and the doctor who performed the injections did so upon the assistant's recommendation without making any assessment of Loughray's functional capacity. Similarly, in a letter dated October 2002, Dr. Gulevich informed Hartford he had injected Loughray with Botox for her headaches. This letter, however, did not opine on Loughray's capacity to work. And although it noted that Loughray reported multiple visits to the emergency room each month for her headaches, no evidence in the record indicates any such emergency room visits occurred. Given the discrepancies and lack of an explicit disability diagnosis by these medical professionals, Hartford acted reasonably in declining to find a disability based on them.

### vi. Closed Head Injury

Loughray next argues that Hartford acted arbitrarily and capriciously regarding her claim that she suffers a disabling condition from a closed head injury. Loughray appears first to have revealed that she fell and lost conscious in 1999 to her original primary care physician, Dr. Brusnchwig, in mid-2000. Dr. Brunschwig, however, did not conclude she suffered from a closed head injury.

23

In contrast, Dr. Cohen specifically diagnosed Loughray as having a closed head injury from her 1999 fall. Dr. Cohen examined Loughray in September 2002 and identified some neurological defects and "slowed" cognitive processing. Dr. Cohen's diagnosis was based in part on his belief that Loughray's cognitive dysfunction had been present since her fall in 1999. The administrative record, however, lacks any objective medical evidence that Loughray had previously suffered any cognitive or neurological dysfunction. In fact, several doctors performed exams that produced normal results. In June 2000, Dr. Kakkar found no "neurological/musculoskeletal problems" (Id. at 787) and Louhray's MRI and MRA produced normal results. In May 2001, Dr. Gass's neurological exam produced normal results, as did a CAT scan in September 2001 and a later neurological exam by Dr. Murray. Thus, Hartford could have reasonably concluded in January 2002 when it terminated Loughray's benefits that she did not suffer from a closed head injury. The subsequent report of Dr. Cohen submitted during the appeals process could have reasonably been viewed as inconclusive given Loughray's prior neurological and cognitive history.

The other medical evidence offered by Loughray also fails to render Hartford's termination decision unreasonable. A physician's assistant at the Mayo Clinic suggested she suffered a closed head injury, but he failed to examine her level of disability. In fact, his neurological exam produced normal results, and he described Loughray as "alert, [and] oriented to person, place, time, and situation." (Id. at 222.) Dr. Groover, Loughray's chiropractor, also identified Loughray as disabled because "her head injury and spinal misalignment" had resulted in "her sympathetic nervous system [being] in

24

constant fight or flight." (Id. at 515.) Dr. Groover, however, failed to specify any medical basis underlying his opinion and later suggests an endocrine problem could be causing Loughray's difficulties. Dr. Murray, of the Rocky Mountain MS Center examined Loughray to determine if she suffered from multiple sclerosis. In concluding that she did not, Dr. Murray suggested that her symptoms were "probably" caused by sleep apnea and/or a prior closed head injury. (Id. at 278.) As mentioned, however, his neurological exam of Loughray produced normal results, and his examinations do not appear to have established any objective findings that would support these two diagnoses or that they were disabling conditions, though his sleep apnea diagnosis ultimately proved true.

A letter provided by Nurse Arlene James is equally inconclusive. Nurse James explained specific functional difficulties Loughray suffered, but there is no indication that Nurse James ever saw Loughray professionally or treated her for anything. Moreover, Nurse James' statements were not entirely consistent with other evidence in Loughray's medical records. For example, she noted a "dramatic change" that Loughray underwent "[i]n 1998," which "result[ed] in overwhelming fatigue, slurred and missing speech and halted and missing thoughts." (Id. at 629.) But Loughray claimed that her disabling condition began in April 2000, and the fall on which Dr. Cohen relied for his diagnosis occurred in 1999.

### vii.    Hartford's Refusal to Consider Dr. Kutz' Report

Nearly 18 months after Hartford upheld its termination decision for the third time, Loughray, in March 2004, submitted another piece of medical information, a report by

25

Dr. Kutz, Ph.D.  Although the other doctors that examined Loughray had not diagnosed Loughray with dementia, Dr. Kutz concluded that Loughray suffered from dementia.  Dr. Kutz believed Loughray suffered serious cognitive problems because she earned a 71 on an IQ test administered in March 2003, notwithstanding Loughray's college education.  Hartford, however, refused to consider the additional evidence submitted by Loughray.

This decision by Hartford does not render Hartford's termination decision arbitrary and capricious.  ERISA requires that a fiduciary "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim."  29 U.S.C. § 1133(2).  Here, Hartford first terminated Loughray's benefits in January 2002, and as discussed above, with a reasonable basis for doing so.  As permitted by ERISA, Loughray then sought a review of that decision, supplementing her request with additional medical information.  Hartford granted Loughray an extension of time to gather material for her appeal before upholding its decision.  Then, Hartford twice reopened the file to reconsider its decision and allow Loughray to supplement her file— once at her request and once at the request of a state agency.  Both times Hartford affirmed its termination decision.

At least by the time Hartford issued its third decision affirming its original termination decision, Hartford had satisfied its obligation to provide Loughray "a reasonable opportunity . . . for a full and fair review."  See 29 U.S.C. § 1133(2).  Neither ERISA nor the Plan required Hartford perpetually to hold open Loughray's file and to go above and beyond this requirement by reopening her file nearly 18 months later.  Cf.

26

Metzger v. UNUM Life Ins. Co. of Am., 476 F.3d 1161, 1166 (10th Cir. 2007) ("Permitting a claimant to receive and rebut medical opinion reports generated in the course of an administrative appeal—even when those reports contain no new factual information and deny benefits on the same basis as the initial decision—would set up an unnecessary cycle of submission, review, re-submission, and re-review."). Deadlines and finality in ERISA administrative decisions are important aspects of the ERISA framework. See Gilbertson v. Allied Signal, Inc., 328 F.3d 625, 635 (10th Cir. 2003) (stating that "deadlines play a crucial role" in ERISA administrative appeals). Once Hartford completed its "full and fair" administrative review, it was not obliged indefinitely to continue considering information submitted by Loughray. See Davidson v. Prudential Ins. Co. of Am., 953 F.2d 1093, 1096 (8th Cir. 1992) (recognizing that, where the administrator reviewed a claim three times but later declined to reopen claimant's file to take new evidence, "the administrative review process must end at some point and in this case [the claimant] has not been denied the opportunity for a full and fair review" (alterations, quotations, and citations omitted)).

### viii.   Other Medical Evidence of Disability

Loughray also criticizes Hartford's "disregard" of a variety of other pieces of medical evidence she feels confirms her disability. Much of this medical evidence was, at best, inconclusive, and given the other information in the administrative record, Hartford acted reasonably in concluding that the evidence that Loughray was not disabled outweighed the remaining pieces of evidence provided by Loughray.

For example, the letters submitted by Drs. Stapleton and Fliege, as well as one submitted by Joyce Campbell, do not show that Hartford abused its discretion in denying Loughray's benefits. Dr. Stapleton's note, a single sentence written on prescription paper, asserts that Loughray was disabled, but lacks any indication of when or for what she treated Loughray. Nor does it precisely identify the ailments that render Loughray disabled. Similarly, Dr. Fleige, in a two sentence note, informed Hartford that Loughray had "frequent allergic reactions[] that often . . . leav[e] her incapacitated for days" and that she "needs to be able to go to the ER for shots of adrenaline" to ameliorate these reactions. (Aple. Supp. App. at 224.) Dr. Fleige, however, does not identify these allergies. And the record fails to contain any information to clarify this diagnosis. Moreover, the record fails to show any visits to the emergency room for allergic reactions. Finally, Campbell, a licensed counselor, also stated that Loughray was "unable to work at this time," but it did not contain any of the specific facts on which Campbell relied to determine Loughray suffered a disability. (See id. at 654.) Thus, Harford had good reason to credit other medical evidence over these letters.

## CONCLUSION

Loughray's situation is a difficult one as she has suffered various maladies since April 2000. Our task, however, is to determine whether Hartford abused its discretion in denying disability benefits to Loughray because she failed to furnish objective medical evidence establishing a disability. Based on the record before us, Hartford had a reasonable basis for discrediting much of the evidence presented by Loughray and for

28

concluding that Loughray did not suffer from a disabling condition.  Accordingly, we

AFFIRM the district court's order upholding Hartford's termination decision.

ENTERED FOR THE COURT


David M. Ebel
Circuit Judge
