FILED
United States Court of Appeals
Tenth Circuit

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

**January 7, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

———————————————————

ALIA ISBELL,

    Plaintiff - Appellant,

v.

UNUM LIFE INSURANCE COMPANY
OF AMERICA,

    Defendant - Appellee.

No. 23-1351
(D.C. No. 1:22-CV-01799-LTB-MEH)
(D. Colo.)

———————————————————

## ORDER AND JUDGMENT*

———————————————————

Before **PHILLIPS**, **McHUGH**, and **MORITZ**, Circuit Judges.

———————————————————

Alia Isbell appeals the district court's dismissal on the pleadings of her claim that Unum Life Insurance Company of America denied her long-term disability benefits in violation of the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001–1461 ("ERISA"). Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

---

    * After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

## I.  Background

### A.    Isbell's benefits claims and initial medical records

Isbell worked as a store manager for Yankee Candle and participated in an employee benefit plan ("Plan") governed by ERISA.  Unum insures and administers the Plan.  The Plan provided benefits for short-term and long-term disability ("STD" and "LTD," respectively).

In April 2019, Isbell's gynecologist, Dr. Rokosz, referred Isbell to physical therapy after diagnosing her with severe pelvic floor pain and spasm.  The physical therapist, Dr. Huang, diagnosed pelvic floor muscle pain and established a treatment plan for Isbell to have physical therapy once every three weeks.  Dr. Huang wrote Isbell a letter stating she could work with certain standing and lifting restrictions that should remain in place through July 19, 2019.  Dr. Huang provided additional letters extending the restrictions through March 1, 2020.[1]

Meanwhile, Isbell submitted an STD claim to Unum on July 8, 2019, when Yankee Candle stopped accommodating her restrictions.  Unum approved the claim. In December 2019, Unum asked Dr. Huang to complete a Fitness-For-Duty Certification as Unum began to transition Isbell to LTD benefits.  In her response, Dr. Huang certified that Isbell could return to work but was restricted from standing or walking more than 45 minutes at a time; lifting more than 1 pound from the floor;

---

[1] Dr. Rokosz also authored two letters with work restrictions through December 1, 2019.

and carrying more than 10 pounds more than 6 times per hour.  Dr. Huang also certified that Isbell could return to work without restrictions on June 1, 2020.

In January 2020, Unum approved LTD benefits retroactive to October 27, 2019.  Unum also explained to Isbell how the Plan's definition of disability would change over time.  For the first twenty-four months of LTD benefits payments, the Plan defines disability to be when Unum determines the participant is "limited from performing the material and substantial duties of [their] regular occupation due to [their] sickness or injury."  Suppl. App. vol. I at 150 (emphasis omitted).  Thereafter, the disability determination turns on whether the same sickness or injury renders the participant "unable to perform the duties of any gainful occupation for which [they] are reasonably fitted by education, training or experience."  *Id.* (emphasis omitted).

UNUM monitored Isbell's progress, periodically reviewing her medical records at "Forum" meetings, often with a physician present, and evaluating whether she could perform any gainful occupation once the definition of disability would change on October 27, 2021.

In February 2021, Dr. Rokosz saw Isbell and assessed abnormal menstrual and uterine bleeding, chronic vaginitis, dysmenorrhea, and myalgia.  In March, Isbell had an ultrasound, and Dr. Rokosz performed a diagnostic hysteroscopy that revealed a uterine fibroid and a thickened endometrial lining.

During this period, Isbell also continued to see Dr. Huang about once a month for pelvic floor instability.  Some of Dr. Huang's notes included a set of restrictions under which Isbell could return to work.  By June 1, 2021, the restrictions were:

3

"sitting for no longer than 45 min at a time, standing for no more than 20 min at a time, lifting [no] more than 1 lb from the floor or bottom shelving at any time, carrying [no] more than 10 lbs 6x/hour, and pushing [no] more than 30 lbs on a cart." Suppl. App. vol. II at 529. In early August 2021, Dr. Huang referred Isbell to a pelvic pain specialist, Dr. Gerig.

Also in early August 2021, a vocational consultant assessed whether there was any work Isbell could perform with Dr. Huang's June 2021 restrictions. The consultant identified three sedentary occupations Isbell could perform given her work history, skills, education, training, and education that "allow for changes in positioning during the workday"—information clerk, receptionist, and personnel clerk. *Id*. at 549.[2]

**B.    Unum considers termination of LTD benefits**

On September 7, 2021, Unum spoke with Isbell and informed her that with the current restrictions, she would not meet the new definition of disability that would take effect on October 27, and Unum intended to cease benefit payments at that time absent some further information from Dr. Huang suggesting otherwise.

---

[2] The consultant described sedentary work as "[m]ostly sitting, may involve standing or walking for brief periods of time, lifting, carrying, pushing, pulling up to 10 Lbs occasionally [up to one-third of the time] with changing positions for brief periods." Suppl. App. vol. II at 549. He also noted that "[t]he material and substantial duties of various administrative or otherwise sedentary or light occupations can be performed in work settings for which changes between sitting and standing postures have no bearing on the performance of duties." *Id.* Isbell has not questioned these characterizations of sedentary work.

Isbell then provided Unum with Dr. Huang's note from a physical therapy session on September 16, 2021. In that note, Dr. Huang added a new restriction—"sitting for no longer than 45 min at a time (with *supine rest break for 15 min afterwards*)." *Id.* vol. III at 600 (emphasis added). The new supine-rest-break restriction prompted Unum to have a clinical consultant perform a clinical analysis. The consultant concluded that Isbell was not precluded from performing the full-time demands of sedentary work because (1) despite reporting pelvic floor pain and spasm, Isbell was going to physical therapy only once a month; (2) Dr. Huang's two most recent treatment notes (August and September 2021) noted improvement in Isbell's condition, and Isbell reported performing activities of daily living ("ADLs") (washing bedding, grocery shopping, vacuuming, climbing stairs, yoga, and cooking dinner) that were consistent with the occupational demands of sedentary work; (3) Isbell had not filled any prescriptions since 2014, and there was no indication that she was advised to take any pain medication or muscle relaxants or that she was referred to a neurologist or pain medicine specialist; and (4) although Isbell had a history of abnormal uterine bleeding and gastroesophageal reflux disease ("GERD"), no lab results, examinations, office visit notes, or vital-sign documentation indicated that those conditions were affecting her functional capacity.

Unum also had a physician who was board certified in internal medicine and infectious diseases, Dr. Belanger, contact Dr. Huang, review the medical records, and prepare a doctoral review. Dr. Huang expressed to Dr. Belanger her concern that sitting for prolonged time periods could worsen Isbell's pelvic pain and thought

Isbell could perform sedentary work if she was allowed to lie down for 5 to 10 minutes once an hour. Dr. Huang estimated Isbell would need another year of physical therapy working toward a goal of needing a break every 2 hours.

On October 1, Dr. Belanger determined Isbell was not precluded from performing sedentary work for multiple reasons: (1) "[t]enderness and hypertonicity of the pelvic floor" that Dr. Rokosz documented in 2019 were not present when Dr. Rokosz examined Isbell in early 2021; (2) although Isbell reported left buttocks numbness, neither Dr. Rokosz nor Dr. Huang described any such numbness in their examination findings; (3) Isbell reported ADLs—"driving 150 miles in a day without symptom increase during all 2021 visits with [Dr.] Huang," "yoga, Pilates and occasionally hiking for exercise"—that suggested her tolerance for sitting and activity exceeded Dr. Huang's restrictions; (4) Dr. Huang's notes from September 2020 "forward consistently document[ed] [Isbell] as being able to carry 12 to 15 pounds up 6 flights of stairs, walk for an hour and sustain moderate activity for up to 2 hours with either no change or a minimal increase in symptoms," which exceed the requirements of sedentary work; (5) the "[i]ntensity of management," including that Isbell did not seek an evaluation from a pelvic pain specialist until October 2021 (Isbell was scheduled to see the pain specialist, Dr. Gerig, on October 14, 2021), was "inconsistent with the nature, severity, persistence and impact of reported symptoms"; and (6) Isbell reported "using ibuprofen 200mg up to every 4 hours only three or four days per week." *Id.* at 634–35.

6

Because her conclusion differed from Dr. Huang's recommendation, Dr. Belanger sought a second opinion from an independent physician, Dr. Green, D.O., board certified in physical medicine and rehabilitation. Dr. Green reviewed Isbell's file and agreed with Dr. Belanger that "the documented clinical improvement, limited physical exam and diagnostic findings and limited ongoing treatment does not support that [Isbell] is precluded from full time participation in" sedentary work. *Id.* at 640.

On October 14, 2021, Isbell saw Dr. Gerig. Among other things, Dr. Gerig noted tenderness in Isbell's back and pelvis and assessed Isbell with a variety of ailments, including constipation, vulvodynia, congenital dysplasia of the hip, neuralgia, neuritis, muscle spasm, and severe primary dysmenorrhea. She referred Isbell to an orthopedist for dysplasia evaluation. Dr. Gerig opined that Isbell could not perform sedentary work because she had severe pain with sitting, had to lie down for relief, was exhausted for the rest of the day after performing one activity, could not concentrate due to pain, and could not stand more than 10 or 20 minutes.

On November 5, 2021, the clinical consultant completed an addendum to his earlier clinical analysis. The consultant concluded that the medical records did not support finding Isbell precluded from sedentary work because, in addition to the reasons the consultant had provided in his initial analysis, Dr. Gerig's exam noted only mild findings. Dr. Belanger called Dr. Gerig but could not reach her, so she wrote to Dr. Gerig, summarizing Isbell's more recent medical records and, in light of

7

the more recent records, inviting Dr. Gerig to support her opinion that Isbell could not perform sedentary work as of October 27, 2021. Dr. Gerig never responded.

Unum continued to consider the medical evidence and to pay Isbell LTD benefits under a reservation of rights. On December 6, Dr. Belanger authored an addendum to her earlier doctoral review, noting that Dr. Gerig's physical examination described Isbell as having a grossly normal gait, an "absence of numbness, tingling, fine motor loss or sleep disturbance," and "tenderness of the pelvic floor muscles." *Id.* at 734. Dr. Belanger also stated that although new therapies were recommended, they "would not be expected to preclude performance of sedentary occupational demands." *Id.*

On December 8, Dr. Green reviewed Isbell's file and agreed with Dr. Belanger's addendum. Dr. Green observed that despite "multiple areas of tenderness and pelvic pain," Isbell had "a normal gait" and no evident "motor or sensory deficits." *Id.* at 739. And Dr. Huang had "reported [Isbell] demonstrates improving activity modification with short rest breaks to allow for long activity periods without symptom aggravation." *Id.* Dr. Green acknowledged Isbell's report that she could only drive for 30 minutes without exacerbating her pain or symptoms and the opinions of Dr. Gerig and Dr. Rokosz that Isbell could not perform sedentary work. Dr. Green then concluded it was "unclear what is preventing [Isbell] from sitting given the absence of weakness or joint instability."

8

### C.    Unum terminates LTD benefits

On December 13, 2021, Unum sent Isbell a letter stating that it had completed its review of her LTD claim. *See id.* at 746–54. Unum explained that as of October 27, 2021, Isbell no longer met the definition of disability, so Unum was terminating LTD benefits. Unum detailed the opinions set out in the reports from Dr. Belanger and Dr. Green and identified the three sedentary jobs the vocational consultant had determined Isbell could perform. And Unum informed Isbell of her right to an administrative appeal.

### D.    Post-termination proceedings

Isbell then obtained counsel, who submitted notes from Dr. Huang, including those spanning ten physical therapy visits from November 2021 through February 24, 2022. Dr. Huang's January 31, 2022, note reported that Isbell had seen an orthopedic specialist and had an MRI that revealed "Bilateral hip dysplasia, CAM impingement, and anterior superior labral microtearing; lumbar vertebra 1–4 stepwise retrolisthesis with facet arthrosis and mild Bilateral sacroiliac joint OA." *Id.* at 842.

The clinical consultant reviewed these notes along with notes from Dr. Gerig's October 2021 exam and from a nurse practitioner, Kari Reynolds Wedell ("N.P. Reynolds Wedell") who Isbell had seen in November 2021. The consultant concluded the new medical information did not change the prior determination that Isbell was not precluded from performing sedentary work because (1) Dr. Huang's notes did not document any new findings, she reported improvement in Isbell's condition, and Isbell's ADLs were on par with the occupational demands of

9

sedentary work; (2) the MRI documented only mild findings, and Isbell's claimed limitations were in excess of those findings; and (3) Dr. Gerig noted only mild findings and a history of congenital hip dysplasia, abnormal uterine bleeding, and GERD, but the objective medical evidence and office notes did not support that those conditions were affecting Isbell's functional capacity.

On April 11, 2022, Unum sent Isbell a written decision summarizing the clinical consultant's explanation and continuing the denial of LTD benefits. *See id.* vol. IV at 1030. The same day, Isbell's counsel provided Unum with additional medical records from the University of Colorado Sports Medicine and Performance Center ("CU Sports Medicine") dated from December 29, 2021, through February 14, 2022. Those records reflect that Dr. Ballantine-Talmadge, D.O., saw Isbell and diagnosed her with degenerative joint disease of the sacroiliac joint; instability of the hip joint, unspecified laterality; spinal curvature; and left hip flexor tightness. She ordered X-rays of Isbell's spine and both hips and an MRI[3] of both hips. The X-rays showed retrolisthesis L1–L4 with associated lower lumbar facet arthrosis, slight rotary levocurvature of the lumbar spine, and mild bilateral sacroiliac joint osteoarthrosis. The MRI revealed CAM-type femoroacetabular impingement of both hips; bilateral acetabular labrum tears; partially torn ligamentum teres at the fovea, bilaterally; and hip dysplasia. Isbell received extra-articular injections (lidocaine and sensorcaine) in both hips on January 20, 2021, and was referred to physical therapy.

---

[3] This was, apparently, the MRI Dr. Huang had referred to in her January 31, 2022, note.

At a follow-up on February 14, Isbell received an intra-articular injection in her left hip and "note[d] improved symptoms with activity immediately after [the] injection." *Id.* at 1039.

Another clinical consultant reviewed all the medical evidence, including the newly submitted records from CU Sports Medicine, and concluded that although the updated office visit notes and diagnostics document that Isbell "has organic findings, she isn't functionally precluded from performing sedentary work," and Dr. Ballantine-Talmadge had not submitted any restrictions or limitations. *Id.* at 1100. Unum then sent Isbell a letter summarizing the new evidence, conveying the consultant's conclusions, and explaining that the new information did not change its prior denial of LTD benefits.

### E.    Isbell's administrative appeal

In June 2022, Isbell's counsel administratively appealed the denial of LTD benefits and submitted new evidence to Unum: notes from a December 2021 visit with Dr. Rokosz; notes from two additional office visits with N.P. Reynolds Wedell in early 2022; statements from Isbell, her husband, and two friends attesting to the severity of Isbell's pain; and a Functional Capacity Evaluation ("FCE") by an occupational therapist ("OT") dated May 13, 2022. In the FCE, the OT concluded that Isbell's "poor tolerance of sitting, standing, and walking greatly impacts her efficiency and ability to focus for work completion," and that "[c]hanging positions every 20 minutes makes it difficult to complete any task." *Id.* at 1125.

11

Unum's appeals department asked an outside physician, Dr. Winkel, D.O., board certified in internal medicine, to review the medical records and provide an opinion on Isbell's ability to perform sedentary work. Dr. Winkel concluded that the medical records "do not document physical, diagnostic, or imaging findings to preclude [Isbell] from performing the sedentary occupational demands from 11/27/2021 forward." *Id.* at 1175. He provided multiple reasons for this conclusion: Serial examinations documented normal cardiac and pulmonary functioning, normal reflexes, normal sensation, varying degrees of motor strength, normal range of motion in the spine and joints, and negative straight-leg raising. Isbell appeared awake, alert, and in no acute distress at her examinations. Dr. Huang reported that Isbell made slow, steady improvement in her physical functioning and endurance. Isbell reported improvement in her pelvic pain and dysmenorrhea with Orilissa (which Dr. Rokosz had prescribed in December 2021) and improvement in her constipation with magnesium. Isbell did not require any increase in pain medications or any emergency evaluations for acute pain. No provider had ever referred Isbell for orthopedic surgical intervention or to gastroenterology for an evaluation of chronic constipation and abdominal pain. Dr. Ballantine-Talmadge provided ongoing hip injections. The FCE exam revealed normal range of motion in the spine and extremities except for pain with left hip range of motion. The lifting and carrying limitations set out in the FCE (lift no more than 12 pounds, carry 12 pounds 40 feet once) were inconsistent with Dr. Huang's findings that Isbell could "carry much

heavier weights for longer distances." *Id.* at 1178. And the FCE described Isbell's gait as slow and guarded, but other providers had noted that her gait was normal.

Unum sent a copy of Dr. Winkel's report to Isbell's counsel, inviting a response. Counsel did not respond to the report but instead supplied additional medical records, including some new physical therapy records and letters from Dr. Huang and N.P. Reynolds Wedell. Unum replied with a letter upholding its denial of LTD benefits. In the letter, Unum conveyed the reasons Dr. Winkel gave in support of his opinion that Isbell could perform sedentary work. Unum also explained that the new materials did not change its prior conclusion to deny benefits. As to Dr. Huang's notes from February 28, 2022, through June 1, 2022, Unum observed that Dr. Winkel had "previously reviewed the time relevant records," i.e., those "through February 24, 2022 and the May 13, 2022 [FCE]," and had determined that those records did not support a finding that Isbell could not perform sedentary work. *Id.* vol. V at 1287. Unum also explained that Dr. Huang's letter (dated June 28, 2022) "outlines information previously provided" and her "continued disagreement with [Isbell's] ability to perform sedentary occupational demands," but Dr. Huang had "not provide[d] any new diagnostic or exam findings for consideration." *Id.* Finally, Unum stated that N.P. Reynolds Wedell's letter (dated June 29, 2022) "mirrors information contained in the records and narratives from her and Dr. Gerig" and "restates the opinion that [Isbell] cannot work in a sedentary job." *Id.*

13

**F.    District court proceedings**

Isbell then filed the action underlying this appeal.  The parties jointly moved for a determination on the administrative record.  The district court ruled in Unum's favor and entered judgment.  This timely appeal followed.

## II.  Standard of Review

"We review a plan administrator's decision to deny benefits to a claimant, as opposed to reviewing the district court's ruling." *Holcomb v. Unum Life Ins. Co. of Am.*, 578 F.3d 1187, 1192 (10th Cir. 2009).  Because the Plan granted Unum discretion to determine benefits eligibility and to construe the terms of the Plan, we review Unum's decision for an abuse of discretion. *See David P. v. United Healthcare Ins. Co.*, 77 F.4th 1293, 1307–08 (10th Cir. 2023).  Under that standard, "we ask whether its denial of benefits was arbitrary and capricious." *Id.* at 1308.  That requires considering "whether [Unum's] benefits determination is predicated on a reasoned basis." *Id.* (internal quotation marks omitted).  "Certain indicia of an arbitrary and capricious denial of benefits include lack of substantial evidence and mistake of law." *Id.* (brackets and internal quotation marks omitted).  "We define substantial evidence as such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decision-maker.  Substantial evidence requires more than a scintilla but less than a preponderance." *Id.* (internal quotation marks omitted).  "In determining whether the evidence in support of the administrator's decision is substantial, we must take into account whatever in the record fairly detracts from its weight." *Id.* (internal quotation marks omitted).

14

However, Unum's "decision need not be the only logical one nor even the best one"; thus, we will uphold Unum's decision "unless it is not grounded on *any* reasonable basis," and we "need only assure that [Unum's] decision falls somewhere on a continuum of reasonableness—even if on the low end." *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1098 (10th Cir. 1999) (brackets and internal quotation marks omitted). "Our review is limited to those rationales that were specifically articulated in the administrative record as the basis for denying a claim," *Ian C. v. UnitedHealthcare Ins. Co.*, 87 F.4th 1207, 1219 (10th Cir. 2023) (internal quotation marks omitted), but only those rationales that were conveyed to the claimant, *David P.*, 77 F.4th at 1313.

The parties acknowledge that Unum operates under an inherent conflict of interest because it determines benefits eligibility and pays the benefits. We weigh that conflict as a factor in determining whether Unum's denial of benefits was arbitrary and capricious. *Weber v. GE Grp. Life. Assurance Co.*, 541 F.3d 1002, 1011 (10th Cir. 2008). We give less deference if a plan administrator "fails to gather or examine relevant evidence." *Kimber*, 196 F.3d at 1097. "A conflict 'should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision and should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy.'" *Holcomb*, 578 F.3d at 1193 (brackets and ellipses omitted) (quoting *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008)).

15

In this case, we give the conflict-of-interest factor limited weight for two reasons. First, Unum did not fail to gather or examine relevant evidence; to the contrary, it repeatedly accepted and reviewed evidence Isbell submitted after the initial denial of LTD benefits. Second, Unum took steps to reduce any bias by hiring two independent specialists, Dr. Green and Dr. Winkel, to review Isbell's LTD claim. *See Holcomb*, 578 F.3d at 1193 (affording limited weight to conflict where conflicted administrator hired independent physicians rather than "rely solely on the evaluations and medical opinions of its own on-site physicians and nurses").

## III. Discussion

### A. Consideration of post-denial medical evidence and pain complaints

Isbell first argues the medical evidence developed significantly between termination of LTD benefits in December 2021 and Unum's denial of her appeal in July 2022. She characterizes Unum's initial termination decision as based on two reasons: (1) insufficient diagnostic evidence to explain her symptoms and (2) lack of evidence of weakness or instability that could explain her claimed inability to sit for long periods. She argues that by the time Unum denied her appeal, neither reason was accurate; she had provided diagnostic evidence in the form of ultrasounds, x-rays, and MRIs, which showed conditions known to affect the ability to sit—torn hip labrums, hip dysplasia, sacroiliac joint instability, and lumbar retrolisthesis with facet arthrosis and mild bilateral sacroiliac joint osteoarthritis. She notes Unum acknowledged that the diagnostic testing revealed "organic findings," Suppl. App. vol. IV at 1100, but she contends Unum did not provide any explanation, let alone a

16

reasoned explanation, for why it did not consider the new medical evidence significant.

We disagree that Unum did not provide a reasoned explanation for why the evidence developed after its initial denial of LTD benefits did not change its decision. First, Unum's acknowledgement that there were "organic findings" does not mean its denial of benefits was arbitrary and capricious. The issue in this case is not whether there is an organic explanation for Isbell's impairments but instead whether she can perform the demands of sedentary work despite the restrictions and limitations that arise from her impairments. *See id.* vol. I at 150 (Plan defining "disability" after 24 months of LTD payments as whether a participant's "sickness or injury" renders the participant "unable to perform the duties of any gainful occupation for which [they] are reasonably fitted" (emphasis omitted)).

Unum's clinical consultant and Dr. Winkel reviewed the post-denial evidence. The consultant reviewed the medical records from CU Sports Medicine but concluded that in light of all the evidence and the lack of any restrictions from Dr. Ballantine-Talmadge, Isbell was not "functionally precluded" from sedentary work. *Id.* vol. IV at 1100. Unum conveyed those reasons to Isbell.

Unum also conveyed Dr. Winkel's evaluation and opinion to Isbell. And as fully recounted above, he provided multiple reasons in support of his opinion that the medical evidence, including the CU Sports Medicine records and other medical evidence submitted after the initial denial of benefits, did not support a finding that Isbell was precluded from sedentary work.

17

Isbell asserts there are flaws in Dr. Winkel's opinion. However, we conclude that none of the purported flaws leads to the conclusion that substantial evidence does not support Unum's denial of LTD benefits.[4]

Isbell contends Dr. Winkel relied on normal cardiac and pulmonary findings without explaining how they were relevant to her ability to sit. We see no problem, as this appears to be part of Dr. Winkel's assessment of Isbell's overall condition and likely relevant to his opinion that "comorbid conditions do not contribute to impairment," *id.* at 1179.

Isbell asserts that Dr. Winkel noted normal exam findings in reflexes and sensation while also noting decreased strength, but he failed to address whether the decreased strength was the type of weakness Unum identified in its initial denial letter. We are unable to find any reference in Dr. Winkel's report to decreased strength. To the contrary, Dr. Winkel noted that both Dr. Ballantine-Talmadge and the OT, whose records and reports are, according to Isbell, among the most important post-denial evidence, had found normal strength, *see id.* at 1177–78, and the OT specifically concluded that Isbell's "lifting abilities, strength and coordination put her at the sedentary level of functioning," *id.* at 1178 (Dr. Winkel apparently quoting,

---

[4] In her reply brief, Isbell points out that Unum did not respond to her specific assertions of error in Dr. Winkel's report. That omission may have been because Isbell presented those assertions in the "Statements of the Facts and Case" section of her opening brief rather than in the argument section. We take up those assertions despite Isbell's failure to expressly incorporate them into her argument that Unum unreasonably relied on Dr. Winkel's report.

without attribution, the FCE, *see id.* at 1125).  We see no abuse of discretion in Unum's reliance on this aspect of Dr. Winkel's report.

Isbell faults Dr. Winkel for focusing on her lack of acute distress at some doctor visits but not discussing parts of the same records stating that her pain levels spiked after performing some ADLs.  Although Dr. Winkel did not make note of such increased pain levels as set out in the early medical records, he did observe that Isbell reported to the OT having "increased pain" in doing the following—"cooking, vacuuming, sweeping, doing dishes, grocery shopping, mopping, cleaning bathrooms, doing laundry, walking, sitting, bending, having sex, performing childcare, driving more than 30 minutes, running errands, exercising, doing religious practices, [and] climbing stairs."  *Id.*  He therefore took account of the relationship between those ADLs and Isbell's pain.

Isbell contends Dr. Winkel "alleged there was no 'escalation' in treatment" but failed to reconcile that view with Isbell's "surgical consultation, the ultrasound-diagnostic hyster[oscopy], referral to a pelvic pain specialist [Dr. Gerig], and the testing and injections by Dr. Ballentine-Talmadge."  Aplt. Opening Br. at 13.  Isbell's contention rests on a mischaracterization of the record.  Dr. Winkel did not say there had been no escalation in *treatment* but instead observed Isbell "has not required escalation of her *pain medications* or *emergency evaluations for acute pain*," Suppl. App. vol. IV at 1179 (emphasis added).  Dr. Winkle in fact referred to the "diagnostic hysteroscopy" Dr. Rokosz performed, *id.* at 1177; the "exploratory

19

laparotomy" Dr. Rokosz[5] discussed but never performed, *id.* at 1179; the referral to

Dr. Gerig, *see id.* at 1177; and Dr. Ballentine-Talmadge's treatment, *see id.* at 1175,

1178–79.  The only oversight we discern is Dr. Winkel's apparent failure to

acknowledge that Dr. Gerig was a pelvic pain specialist.  *See id.* at 1179 (stating

Isbell "had not been referred to . . . pain management for the chronic pelvic pain").

That misstatement, however, does not give us pause because Dr. Winkel based his

ultimate opinion in part on improvement in pain with Orilissa, *see id.* at 1177, and

the lack of any referral "to orthopedics for evaluation for surgical interventions,"

*id.* at 1179.  Both of those reasons lead us to conclude that had Dr. Winkle

recognized that Dr. Gerig was a pain specialist, his assessment of Isbell's functional

capacity would be the same.[6]

Isbell further faults Dr. Winkel for relying on the FCE as showing Isbell was

not precluded from sedentary work "because she was able to complete sedentary

work activity that one day," but not considering Isbell's report that she experienced

---

[5] Isbell appears to misattribute the "surgical consultation" to N.P. Reynolds Wedell.  *See* Aplt. Opening Br. at 9 (stating that Isbell saw N.P. Reynolds Wedell "for consideration of a surgical laparotomy").  We see no such consultation in N.P. Reynolds Wedell's treatment notes or in the pages of the record to which Isbell cites.  We do see a reference to an exploratory laparotomy in Dr. Rokosz's notes.  *See* Suppl. App. vol. IV at 1127.  But even if Isbell did see N.P. Reynolds Wedell for a surgical laparotomy consult, it would not change our analysis.

[6] Although Unum appears to refer to Dr. Ballantine-Talmadge as an orthopedist, *see* Aplee. Resp. Br. at 27 (noting Isbell saw "an orthopedist three times"), she was an osteopath, *see, e.g.*, Suppl. App. vol. IV at 1082 (note signed "[Dr.] Ballantine-Talmadge, DO").  Thus, Dr. Winkel accurately stated Isbell had not been referred to orthopedics for surgical intervention.

"a severe spike in pain for several days" after the FCE.  Aplt. Opening Br. at 13.  As noted, however, Dr. Winkel was well aware of Isbell's complaints that her pain increased after certain types of activities.  Moreover, the FCE clearly required Isbell to engage in activities that exceed the demands of sedentary work, thus making her resultant pain a poor indicator of her ability to tolerate sedentary work.

Isbell argues there is evidence that her conditions are known to cause pain with prolonged sitting, and that Unum gave little consideration to, and impermissibly discredited, her pain complaints and the opinions of treating providers that she should avoid prolonged sitting.  But Unum identified substantial evidence in the record supporting its view that Isbell's pain with prolonged sitting did not preclude sedentary work:  a long history of Isbell performing numerous ADLs, decreased pain with Orilissa and hip injections, and lack of any functional restrictions in the records from Dr. Ballantine-Talmadge.  In view of the fact that sedentary work, as defined for purposes of Isbell's claim, "can be performed in work settings for which changes between sitting and standing postures have no bearing on the performance of duties," Suppl. App. vol. II at 549,[7] Unum's conclusion regarding limitations due to pain associated with prolonged sitting falls at least on the low end of the reasonableness continuum.  *See Kimber*, 196 F.3d at 1098.

Isbell points out that Unum did not conduct its own in-person medical exam ("IME") and argues that this weighs in favor of concluding Unum arbitrarily

---

[7] Dr. Winkel's report was expressly based on this definition.  *See* Suppl. App. vol. IV at 1175.

21

discounted her pain complaints. In support of her argument, she relies on *Smith v. Continental Cas. Co.*, 450 F.3d 253 (6th Cir. 2006). In *Smith*, the Sixth Circuit concluded that the plan administrator's reliance on a file review by an outside physician, rather than conduct an IME, supported a determination that the administrator had acted arbitrarily. *Id.* at 263–64. The Sixth Circuit reasoned that the outside physician's statement that "[p]ain is a subjective complaint and often times is out of proportion to physical findings" amounted to a "credibility finding[]" about the plaintiff's "pain without the benefit of a physical exam." *Id.* Here, however, Dr. Winkel made no similar credibility finding but instead focused on whether Isbell retained the functional capacity to perform the demands of sedentary work despite her pain.[8] Finally, we note that Unum informed Isbell early in the claims process that she or her "attending physician" had the right to request an IME

---

[8] Isbell also relies on *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276 (10th Cir. 2002), for the propositions that (1) an administrator's failure to conduct an IME "justifies less deference to the decision," Aplt. Opening Br. at 20 (citing 287 F.3d at 1289); and (2) an administrator must consider "an in-person exam," Aplt. Reply Br. at 9–10 (citing *Caldwell* with no pin cite). We see no such principles in *Caldwell*. Instead, on page 1289, the court considered a matter of first impression— "[w]hether an administrator must consider [vocational] evidence" before denying disability benefits under an "any occupation standard." 287 F.3d at 1289 (internal quotation marks omitted). And there is no mention of an IME.

Furthermore, although also not cited in the argument section of her opening brief, Isbell cites another circuit case, *Montour v. Hartford Life & Accident Ins. Co.*, 588 F.3d 623 (9th Cir. 2009), concerning the amount of deference to afford a decision when the administrator fails to conduct an IME. *See* Aplt. Opening Br. at 20 (citing *Montour*). But in *Montour*, the failure to conduct an IME was an analytical factor because it was not clear the administrator presented the insurer's own reviewing physicians "with all the relevant evidence." *Id.* at 634 (internal quotation marks omitted). Isbell makes no such accusation here.

"should opinions differ on the degree of medical impairment," Suppl. App. vol. I at 209, but she never requested one. For all these reasons, we decline to treat Unum's failure to conduct an IME as weighing in favor of concluding Unum acted arbitrarily.[9]

## B.    Engagement with medical evidence

Isbell argues "Dr. Winkel's report and Unum's final letter demonstrate" that Unum did not "meaningfully engage with the contrary opinions of [her] treating doctors" but instead "mere[ly] review[ed] . . . the file without engaging the information" or explaining "why they disagreed." Aplt. Opening Br. at 25–26 (emphasis omitted). She contends Unum failed to comply with ERISA's requirements regarding meaningful engagement with the medical evidence. We disagree.

Under ERISA, a plan administrator must "provide adequate notice in writing . . . setting forth the specific reasons for such denial" and "afford a reasonable opportunity . . . for a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133. "[F]ull and fair review of a denial must include: knowing what evidence the decision-maker relied upon, having an

---

[9] As Unum points out, this court has held that IMEs may be "helpful" but are "not required," *Fought v. UNUM Life Ins. Co.*, 379 F.3d 997, 1015 (10th Cir. 2004); *abrogated in part on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 116 (2008), *as recognized in Holcomb*, 578 F.3d at 1192–93. We considered that general rule, however, when evaluating a plan administrator's conflict of interest, *id.*, not when evaluating whether an administrator should be required to conduct an IME where subjective pain complaints are at issue.

opportunity to address the accuracy and reliability of the evidence, and having the

decision-maker consider the evidence presented by both parties prior to reaching and

rendering [a] decision." *D.K. v. United Behav. Health*, 67 F.4th 1224, 1236

(10th Cir. 2023) (internal quotation marks omitted), *cert. denied*, 144 S. Ct. 808

(2024).  We have characterized these requirements as a "duty to engage in

meaningful dialogue" with a participant.  *Id.* at 1238.  "[A]dministrator statements

may not be conclusory and any health conclusions must be backed up with reasoning

and citations to the record."  *Id.* at 1242.  An administrator "may not arbitrarily

refuse to credit a claimant's reliable evidence, including the opinions of a treating

physician," but ERISA does not require an administrator "to accord special weight to

the opinions of a claimant's physician."  *Black & Decker Disability Plan v. Nord*,

538 U.S. 822, 834 (2003).

Unum met this standard.  In its denial letters, it informed Isbell of the evidence

on which it relied.  It repeatedly gave Isbell the opportunity to submit additional

medical evidence, and when she did, Unum considered it, sometimes seeking further

information from a provider, and Unum issued a new decision explaining the reasons

for denying benefits.[10]  It engaged two outside physicians to review the case.  It

---

[10] Although Isbell asserts that much of her evidence was not available until her appeal, it appears that on several occasions after the initial denial of LTD benefits, she submitted medical records she could have submitted earlier.  For example, on April 11, 2022, Unum issued a letter upholding its denial of benefits.  That same day, Isbell submitted the CU Sports Medicine records, which concerned visits from December 2021 to February 2022.  And most of the medical records she submitted with her appeal in June 2022 also predated the April 11, 2022, letter.  Despite these unexplained delays, Unum considered the belatedly submitted records.

provided a copy of Dr. Winkel's report to Isbell's counsel in advance of its decision on her appeal and invited a response, but counsel did not respond, choosing instead to submit more medical evidence. As discussed above, Dr. Winkel's report did not arbitrarily discount the opinions of Isbell's treating doctors regarding her ability to sit for prolonged periods or perform sedentary work, but instead set out reasons, supported by substantial evidence in the record, for his disagreement with those opinions. And Dr. Winkel provided extensive citations to the record. We therefore reject Isbell's "meaningful engagement" argument.

## C.   Unum's consideration of the FCE

Isbell argues that UNUM did not fairly consider the FCE. She first contends that Dr. Winkel criticized the FCE because the OT observed that Isbell had a limp whereas the older physical therapy records did not document a limp. Isbell explains that the hip injection she had in early 2022 "caused that limp," so she claims Unum could not rationally rely on Dr. Winkel's analysis. Aplt. Opening Br. at 26.   This argument rests on a misreading of Dr. Winkel's report. He did not refer to the limp the OT had observed, but instead recorded that the OT noted Isbell had "a slow guarded gait, whereas the other providers had noted normal gait without assistive devices." Suppl. App. vol. IV at 1179. We see nothing improper in Dr. Winkel's reliance on the observations of the other providers, many of whom saw Isbell on more than one occasion, as a factor in his consideration of the FCE's value as evidence of Isbell's functional capacity.

25

Isbell also addresses Dr. Winkel's statement that "[t]he lifting and carrying" the OT documented—"able to lift 10 pounds 1 time from floor to waist, waist to shoulder, waist [to] overhead" and to carry "12 pounds 40 feet 1 time"—"were not consistent with the findings of Dr. Huang who noted [Isbell] to be able to carry much heavier weights for longer distances." *Id.* at 1178. She claims it was error to fault the FCE in this regard because there had been significant changes between her earlier physical therapy visits and her FCE. We are unpersuaded. Dr. Winkel and Unum both accepted the FCE's documentation that "Isbell's lifting abilities, strength, and coordination put her at the sedentary level of functioning," *id.* at 1125. *See id.* at 1179 (Dr. Winkel's observation that the FCE documented that Isbell's "[m]otor strength was adequate to perform sedentary occupational demands"); *id.* vol. V at 1286 (Unum's letter denying appeal noting same). Thus, their mere observation that Dr. Huang's earlier records recorded greater carrying ability than the OT recorded in the FCE had no appreciable effect on the outcome.[11]

---

[11] Our analysis renders it unnecessary to address Isbell's argument that FCEs are "the gold standard for assessing functionality," Aplt. Opening Br. at 27, or Unum's response that an FCE is not "objective evidence" because "a participant has subjective control over the level of effort they use to perform the tasks in the FCE" and that an FCE is "only a piece of information that must be evaluated in light of everything else," Aplee. Resp. Br. at 45–46.

## IV.  Conclusion

The district court's judgment is affirmed.

Entered for the Court

Carolyn B. McHugh
Circuit Judge